[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION FOR ADDITURAND MOTION TO SET ASIDE VERDICT
The plaintiff Isabel Parasco moves this court for an additur on the grounds that the jury award of $2,500 non-economic damages was so inadequate that it shocks the sense of justice as to what is reasonable.
Section 52-216a of the General Statutes provides, in pertinent part, as follows:
 ". . .If the court concludes that the verdict is inadequate as a matter of law, it shall order an additur, and upon failure of the parties so ordered to add the amount ordered by the court, it shall set aside the verdict and order a new trial."
Further, Section 52-228b provides as follows:
 "[n]o verdict . . . may be set aside solely on the ground that the damages are inadequate until the parties have first been given an opportunity to accept an addition to the verdict of such amount as the court deems reasonable."
The decision to order an additur is a matter of judicial discretion. Childs v. Bainer, 235 Conn. 107 (1995). The court in Childs explored the parameters of a trial court's discretion in ruling on a motion for additur. "We have considered whether: (1) the jury award `shocks the conscience'; . . . (2) the plaintiff, who has proved substantial injuries, is awarded inadequate damages; . . . (3) the verdict is `inherently ambiguous';" at 114-115. ". . .The trial court's refusal to set aside the verdict or to order an additur is entitled to great weight and every reasonable presumption should be given in favor of its correctness. . .If on the evidence, the jury could reasonably have decided as they did, [the reviewing court] will not find error in the trial court's acceptance of the verdict. . .However, it is the court's duty to set aside the verdict when it finds that it does manifest injustice." Childs, supra 112-113.
In determining whether a verdict does such injustice, "`the only practical test is whether the total damages awarded fall somewhere within the necessarily uncertain limits of fair and CT Page 1957 reasonable compensation in the particular case, or whether the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption.' (citations omitted). A direct showing of partiality, prejudice, mistake or corruption is not required. `[I]f the amount awarded "shocks the sense of justice" as to what is reasonable, then the inferred conclusion is that the jury was misguided in reaching its decision. . .' (citation omitted)" Malmberg v. Lopez, 208 Conn. 675. 680 (1988).
Following are the relevant facts. This was a hearing in damages, liability having been admitted. The case involves an underinsurance claim against the plaintiff's insurance company. The claim arose from an automobile accident which took place on November 9, 1986. The plaintiff, Isabel Parasco was a pedestrian walking across the driveway toward the entrance to the Showcase Cinemas in East Hartford, when a car driven by Maria Ferreira pulled away from a parked position at the curb, drove into the plaintiff, caused her to be thrown onto the hood of the car and from there onto the pavement, where she struck her head and was rendered unconscious. The plaintiff was taken by ambulance to the Hartford Hospital where she was treated for bruises, abrasions and contusions particularly on the left side of her head and left hip. The swelling on the left hip became the size of a watermelon. Ten years later during the instant trial the jury was able to observe a significant lump on that hip, which hip was permanently disfigured.
Following her emergency treatment at the hospital the plaintiff was released in the early hours of the morning to her home where she remained in bed three days before she was able to ambulate comfortably enough to see her family doctor. On November 12, 1986 the plaintiff saw her family doctor, June McDonald, with complaints of feeling faint and nauseated. On examination Dr. McDonald found multiple bruises of the left side of the head and left hip. There was a bruise over the right greater trochante and the plaintiff was unable to lift her right arm. Following this on November 19, 1986 she was seen by an orthopedic doctor, Harry Gossling. Dr. Gossling's examination disclosed a probable rotator cuff tear of the right shoulder, possible fractured pelvis, contusion of the right hip with hematoma, contusion of the right scalp with laceration.
The plaintiff was given treatment by Dr. McDonald on May 22, 1987 with continuing complaint of shoulder pain and severe CT Page 1958 headaches. Dr. McDonald in her report dated October 5, 1987 noted that the plaintiff had been unable to return to her work at Aetna since the accident of November 9, 1986.
On June 29, 1988, the plaintiff saw another orthopedic surgeon, Kevin Dowling (now deceased) who found her condition at that time, twenty months post-injury to be "AC arthritis aggravated by trauma, shoulder cuff tendinitis post-trauma, traumatic-hematoma, rt. thigh."
Plaintiff's headaches were a continuing problem, so that on May 3, 1988, Dr. McDonald referred her to a neurologist, Dr. Edward Fredericks, with her chief complaint of recurrent migraines, which had worsened since her accident.
On September 13, 1990, the plaintiff consulted The New England Center for Headache, because of her continuing headaches. An EEG done at the Center on October 17, 1990 indicated abnormal EEG indicating left cerebral dysfunction and bilateral cerebral dysfunction with continued irritability. Abnormal FFT suggestive of left temporal dysfunction.
On March 18, 1991, the plaintiff was admitted to Greenwich Hospital. She was continuing to experience severe incapacitating headaches which lasted from one to three days. These were accompanied with severe nausea and vomiting, phono and photophobia. In her efforts to get relief she became dependant on her prescribed pain medication to a point where she overused it and needed to get her medication consumption down to a manageable level so as to again be able to get relief.
While treating for her headaches the plaintiff was also from June 16, 1992 to July 23, 1992, receiving physical therapy from Connecticut Physical Therapy/Sports Medicine for her neck and shoulder problems. The prior year the plaintiff had again returned to Dr. Fredericks and her orthopedist, Dr. Gossling, because of her continuing discomfort in those areas. Dr. Fredericks reported on October 24, 1991, that the plaintiffs history was consistent with daily muscle contraction-tension headaches and frequent migraine, that she had every conceivable headache treatment over the years and remained a very difficult management case. Dr. Gossling on November 19, 1991, diagnosed subacromial bursitis, chronic right shoulder, and residual byroma right thigh. CT Page 1959
On June 14, 1993, the plaintiff was again admitted to Greenwich Hospital for treatment of her incapacitating headaches and again to get her medication consumption under control. She was discharged on June 20, 1993. On July 21, 1993 she returned to Dr. Sheryl E. Siegel at the New England Center for Headache, with nausea and palpitations. Plaintiff was again seen by Dr. Siegel on December 10, 1993, her headaches having become so severe that she was moaning in public. The plaintiff was referred on December 27, 1993, back to Regional Physical Therapy for evaluation and treatment of pain resulting from the 1986 accident. The plaintiff saw Dr. Siegel again on March 24, 1994 with out of control headaches.
On July 8, 1994 Dr. Siegel again noted persistent headaches and that the plaintiff was experiencing nausea and insomnia. At this point Dr. Siegel's diagnosis was anxiety disorder — chronic nausea.
On November 3, 1994 the plaintiff was sent by Dr. McDonald to Dr. John Raycroft of Orthopedic Associates of Hartford, because of plaintiff's ongoing complaints of pain in the upper back and right shoulder. She returned to Dr. Raycroft on December 9, 1994 with continuing complaints of pain, chiefly in the right shoulder. Dr. Raycroft noted the plaintiff had significant trapezius spasm on the right side that day.
On December 21, 1994, the plaintiff was again seen by Regional Physical Therapy for pain in the upper back and neck, and severe incapacitating headaches.
On June 20, 1995, the plaintiff returned to Dr. Raycroft for a disability evaluation. His impression was chronic impingement symptoms involving the right shoulder and based on the examination of that date found a 5 percent partial impairment of the shoulder.
On July 12, 1995 the plaintiff returned to Dr. Siegel with complaints of constant headaches. Dr. Siegel evaluated the plaintiff's condition as permanent and determined she was 80 percent disabled by headache and that her present condition was a result of the 1986 accident which aggravated or exacerbated the plaintiff's underlying headache condition.
The plaintiff Isabel Parasco was 55 years old when the 1986 accident took place. She grew up in New York City where she went CT Page 1960 to New York University and Brooklyn College. She was certified to teach in New York and taught there for two years. During this period she met and married her husband who was in the air force and following her marriage went to live in California where he was stationed. She worked in California first in an insurance company and then at the air force base there. Following her husband's discharge in 1956 they came back to New York and after three months moved to Connecticut where her husband began working at Pratt and Whitney. They bought their home in Glastonbury in 1958 where she and her family continued to live.
Between 1956 and 1969 the plaintiff also worked. During this period she had her three children. Her daughter was born in 1960, her son in 1968, and her last child in 1969. During this period she taught in the Glastonbury School System for a total of five years. She had done substitute teaching and thereafter was certified in July of 1965. In 1969 she decided she should be at home with her three children.
The plaintiff also had her parents with whom she was closely involved. In 1975 her father started with Alzheimers and eventually had to be admitted to a convalescent hospital. Her mother's health also began to fail to a point where she became bedridden and required constant care. At that point she was living with the plaintiff.
In 1983 the plaintiff learned that her husband had been having an affair with another woman for several years. They separated and became legally separated in 1985. During the period of their separation efforts at reconciliation failed but they continued to have a friendly relationship. In fact, the evening of the accident they were both going to the movies together. He had just parked the car and was walking toward her when she was struck by the Ferreira car.
In 1984 following the death of her mother the plaintiff began doing temporary work. She had applied to get back into teaching but there were no openings. The temp agency sent her to Aetna. By 1985 she was working full time at Aetna but in a temp status. At Aetna she was putting in 50 to 60 hour weeks. She enjoyed her work, was well liked by her co-workers, got high evaluations and felt a sense of accomplishment and pride in her ability to do what she was doing. This all came to an end on November 9, 1986. She was never physically able to return to her Aetna job. She tried going back in 1987 but was unable to carry on and after a CT Page 1961 handful of weeks left. She subsequently got part-time work at a local bakery working in the store front. Her arrangement was flexible enough to permit her to leave when her headaches became severe which was often. When the bakery closed in 1993 her employment ceased. She has not worked since 1993.
Plaintiff's health over the years prior to the accident was good. She as a child experienced migraines but these were not regular nor did they impede her activities. Throughout her adult life she experienced migraines off and on but they did not impede her ability to engage in her daily activities of work, child-care, housekeeping, and recreation. She lived a full life. Following the 1986 accident when she sustained her head injury, the headaches she suffered were different. They were very severe, constant and disabling. They affected her ability to function and in fact disabled her to a significant extent from functioning.
In 1983 when the plaintiff learned of her husband's infidelity she suffered a period of depression but was able to bounce back and in fact take on full time employment which she enjoyed and in which she performed well.
On January 4, 1992, the plaintiff was a front seat passenger in her sister's car which was stopped at an intersection. A cab slid into it causing the rubber of the rear bumper to buckle in and then push out. The damage was $208. The impact was minimal. Plaintiff's sister insisted plaintiff see a doctor even though plaintiff did not think she needed to for this incident. She still had the neck and shoulder complaints from the 1986 accident and was still treating for those having seen Dr. Gossling as recently as a month and a half before when he had diagnosed subacromial bursitis, chronic right shoulder and residual byroma right thigh. To satisfy her sister the plaintiff went back and saw Dr. Gossling, told him about the January 4, 1992 incident and told him her neck and shoulder pains and headaches continued. He attributed these to the January 4, 1992 accident without mentioning or factoring in the injuries which he had treated her for after the 1986 accident and which as recently as the previous November 1991, had diagnosed. Because of these complaints Dr. Gossling referred her to Dr. Fredericks who though he had seen her after the 1986 accident and saw her again on this latest referral had scant information on the dynamics of the 1986 accident and knew nothing of the kind of activities she had engaged in prior to the 1986 accident, i.e. her full employment, her child rearing, her caretaking of parents etc. so that when CT Page 1962 Dr. Fredericks opinioned inability to make a causal connection of the headaches with the 1986 accident and instead characterized her a drug dependent, such dependency being causally related to the headaches and depression, he was without any information as to the kind of person she was before the 1986 accident and which she had become after the 1986 accident.
Finally Dr. Donaldson's opinion, that the plaintiff was suffering from rebound headaches from taking too much medication and that her common migraines were the cause of the depression and psychological disorder, was given with no awareness whatsoever of the 1986 accident. Dr. Donaldson admitted he had no background information as to the plaintiff and none as to the 1986 accident which had involved a head injury. When offered the opportunity to review medical records dealing with the 1986 accident Dr. Donaldson agreed to do so but after a minute or two of thumbing a few sheets, indicated he did not need to know anymore than he had when he gave his opinion.
The defendant in his motion in opposition to setting aside the verdict argued that the plaintiff had not called Dr. Gossling, Dr. Fredericks and Dr. Donaldson because she did not agree with their opinions. In fact the plaintiff put into evidence before any of these three doctors were called all of the medical records available to her involving these doctors. The defendant argues that based on the evidence presented from these physicians alone the jury could very well have totally discounted any and all complaints relating the alleged headaches, shoulder disability, pain and suffering to the 1986 accident. Had this been the case the jury could not have come up with the substantial economic damages figure they awarded.
This court has devoted a significant amount of time in this decision to detailing the evidence which was before the jury in this case. There was no evidence before this jury that the plaintiff was in any way compromised in her life activity from migraine headaches before the 1986 accident. After the 1986 accident she became in fact so substantially disabled that her life from the age of 55 on became a nightmare of pain. Drug dependency and rebound headaches did not exist prior to the 1986 accident. The plaintiff was working 50 to 60 hours a week prior to the 1986 accident. She has not been able to do any significant work since the 1986 accident. She has suffered permanent injury to her neck and shoulder and as recently as 1994 had back spasms detected in her shoulder. CT Page 1963
The jury awarded $33,897.25 economic damages and $2,500 non-economic damages for a total award of $36,397.25.
On the facts of this case the court finds an award of $2,500 non-economic damages shocks the conscience. It is totally inconsistent with the severity of the injuries suffered. The court finds the plaintiff has proven substantial injuries for which she has been awarded inadequate damages. The court finds the verdict which awards substantial economic damages but awards negligible non-economic damages to be inherently ambiguous.
Under the provisions of Section 52-216a of the Connecticut General Statutes if the court concludes that the verdict is inadequate as a matter of law, it shall order an additur. It is the conclusion of this court that the verdict is inadequate and grants an additur of $72,500 to the non-economic damages figure of $2,500 for a total non-economic damages award of $75,000.
An additur of $72,500 is ordered. If the defendant does not accept such additur, the verdict is set aside and a new trial is ordered.
Hennessey, J.